IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ERIN K.S.,[1] ) | |
| ) | |
|       **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 21-cv-1260-DWD |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
|       **Defendant.** ) | |

**MEMORANDUM AND ORDER**

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for a Period of Disability and Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423 and 42 U.S.C. § 1383(c). For the reasons discussed below, the final agency decision is due to be reversed.

**Procedural History**

Plaintiff applied for a period of disability and DIB alleging a disability onset date of August 1, 2017 (Tr. 14). The claim was denied initially on October 23, 2019, and upon reconsideration on May 11, 2020 (Tr. 14). After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on March 30, 2021 (Tr. 11, 32). The Appeals Council denied Plaintiff's request for review on August 19, 2021 (Tr. 1), making the ALJ's decision the final agency decision subject to judicial review. *See* 20

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

1

C.F.R. § 404.981. Plaintiff exhausted administrative remedies and filed a timely complaint with the Court seeking judicial review.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520. An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Here, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (internal citations omitted). In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. At step one, she determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, August 1, 2017, through her date last insured of June 30, 2020 (Tr. 17). At step two, the ALJ found that Plaintiff has the following severe impairments: attention deficit disorder (ADD), anxiety, unspecified psychotic disorder, personality disorder, depression, bipolar disorder, post-traumatic stress disorder (PTSD), bilateral sensorineural hearing loss (Tr. 17). The ALJ also found that Plaintiff had the

3

following impairments that are severe only in combination: obesity, osteoarthritis of the right knee, and fibromyalgia (Doc. 17).  The ALJ found these medically determinable impairments to significantly limit Plaintiff's ability to perform basic work activities (Tr. 17).  In addition, the ALJ found that Plaintiff to have several nonsevere or "not medically determinable" impairments, including hypertension, migraine headaches, irritable bowel syndrome (IBS), and hypothyroidism/Hashimoto's disease (Tr. 17-18).

The ALJ concluded that Plaintiff had a moderate limitation in the functional area of concentrating, persisting, or maintaining pace, and mild limitations in the functional areas of understanding, remembering, or applying information; interacting with others; and adapting or managing oneself (Tr. 18-20).  At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings set forth in the Listing of Impairments (Tr. 18).  The ALJ specifically considered Listings 1.02, 12.03, 12.04, 12.06, 12.08, 12.11, and 12.15, in addition to SSR 12-2p and SSR 19-2p (Tr. 18).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except:

> she can never climb ladders, ropes, or scaffolds, and only occasionally climb ramps and stairs. The claimant can occasionally stoop, kneel, crouch, and crawl. She can occasionally balance on uneven, narrow, slippery or erratically moving surfaces. The claimant can have no more than occasional exposure to vibration or hazards such as unprotected heights. She can work in an environment with no more than a moderate noise level as defined in the *Selected Characteristics of Occupations*. She can perform work limited to simple, routine, repetitive tasks, and make simple, work-related decisions. The claimant can perform work that is not at a production pace rate, defined

as work with an assembly line or conveyor belt.

(Tr. 21).

At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work through the date last insured (Tr. 28). At step five, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy based on Plaintiff's age, education, work experience, and residual functional capacity (Tr. 28-31). The VE specifically testified that Plaintiff could perform the requirements of occupations such as housekeeping worker, retail clerk, and laundry folder, which exist in significant numbers in the national economy (Tr. 30). Accordingly, the ALJ found that Plaintiff was not disabled through the last date insured (Tr. 31-32).

## The Evidentiary Record

Plaintiff only challenges the ALJ's Step Five finding (Doc. 12). While the Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order, the following summary of the record is directed to the points raised by Plaintiff on review.

An evidentiary hearing was held on December 14, 2020 (Tr. 40). Plaintiff was represented by an attorney at the evidentiary hearing (Tr. 40). Brenda Young, a vocational expert ("VE") also testified at the hearing (Tr. 60). Ms. Young's resume provides that she has an M.A. in Guidance and Counseling and a B.A in Psychology and Sociology, along with certifications as a rehabilitation counselor (CR.C.), disability management specialist (C.D.M.S.), and a licensed professional counselor (L.P.C.) (Tr. 293-

294). Her resume also describes her professional experience as a career consultant since approximately 1984, where she provides vocational evaluations, and the impact of injury on employability, earning capacity, wage, and job skills, in addition to labor market research and documentation of employment options and transferable skills (Tr. 293). Her resume also indicated that she has previously served as a vocational expert in SSA proceedings (Tr. 292).

The ALJ asked the VE to consider a hypothetical based on an individual with the following limitations:

> [W]ho is a younger individual with more than a high school education [with Plaintiff's past work] who is limited to light work. The individual could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, kneel, crouch or crawl. The individual could occasionally balance on uneven, narrow, slippery, or erratically moving surfaces. The individual should have no more than occasional exposure to vibration or to hazards such as unprotected heights. The individual can work in an environment with no more than a moderate noise level as defined in the Selected Characteristics of Occupations. The individual would be limited to simple, routine, repetitive tasks with simple work-related decisions and could perform work that was not at a production rate pace, which I will define as work with an assembly line or conveyor belt.

(Tr. 61). The VE testified that this hypothetical individual would not be able to perform Plaintiff's past work as an office manager, patient coordinator, or bartender/server (Tr. 61- 62).

However, the VE opined that this hypothetical individual could perform light exertional work, including: Housekeeping type jobs (DOT Code 323.687-014), classified as light and unskilled with an SVP: 2, with approximately 900,000 jobs nationally; Retail Clerk (DOT Code 299.677-010), classified as light and unskilled with an SVP: 2, with

6

approximately 4 million jobs nationally; and Laundry folder (DOT Code 369.687-018), classified as light and unskilled with an SVP: 2, with approximately 105,000 jobs nationally (Tr. 62). The VE further testified about the tolerance for time off-task and absences for unskilled work (Tr. 62). The VE opined that there would be "no established amount" of tolerance "for time off-task" but that, accounting for variances by job and employer, this tolerance would "be less than 10 percent in any case." (Tr. 62). Similarly, tolerance for absences would be "not more than once a month and not every month consecutively" (Tr. 62).

Plaintiff's attorney questioned the VE briefly about the RFC and her methodology:

Q. If the individual would need to be redirected six times per day, would the jobs you cited or any other jobs be available?
**VE**: No.
Q. And how did you estimate the numbers that you provided today?
VE: They're based on research by the Bureau of Labor Statistics.
Q. And are the numbers based on a grouping of DOTs or the specific DOT that you've provided?
**VE**: A grouping.
Q. Are the numbers estimated for this specific DOT that you provided.
**VE**: No, they don't record them that way.
Q. Okay. So is it based on a grouping?
**VE**: Yes, that's what I said.
Q. Oh, okay. I'm sorry. I did not hear you.
**VE**: I'm sorry.
Q. All right. That's okay. Thank you. I don't have any additional questions.

(Tr. 63).

The ALJ then reexamined the ALJ:

ALJ: Ms. Hale and I asked you a few things the DOT is specific on, certainly off-task and absenteeism, probably different kinds of surfaces, and then, of course, job numbers. Is there anything else that I missed you think []?
**VE**: I don't think so. I don't know that they specifically deal with pace.
ALJ: Pace, okay. What was your testimony based on this with regards to

7

> those things?
> **VE**: Based on my experience in job placement and job analysis.
> ALJ: Okay. And was the remainder of your testimony consistent with the DOT?
> **VE**: Yes.

(Tr. 63-64). At the close of the hearing, Plaintiff's attorney confirmed, in response to a question by the ALJ, that she had "nothing further [to add] for today." (Tr. 64).

The same day, but after the hearing, Plaintiff's attorney submitted a letter to the ALJ, stating that she objected to the VE's testimony:

> Please note that 20 CFR 404.935(b), 416.1435(b)(3) allows that new VE testimony given during a hearing may be addressed by the claimant in a post-hearing written statement, not subject to the 5-day rule, 81 Fed. Reg. 90987, 90991 (Dec. 16, 2016). In this case, I have reviewed the VE's hearing testimony and we object. The VE's opinions as to job incidence data lack a reliable methodology. There is no specific confirmable methodology described in the record, and no evidence that the VE's methods for obtaining job incidence data are reliable and well-accepted, or why that is so. The record is unacceptably vague, and this fails to satisfy the Commissioner's burden at step five.

(Tr. 295).

The ALJ acknowledged Plaintiff's objection in her decision, but overruled it, explaining:

> The claimant's representative had ample opportunity at the hearing to ask questions of the vocational expert and clarify her methodology. However, after reviewing the vocational expert's testimony at the hearing, I found the records did not support these objections. The objections are overruled. My decision to overrule the objections was based on the Regulations, including SSR 00-4p, that govern this hearing.
>
> [A]dministrative notice of reliable job information available will be taken from various governmental and other publications. For example, we will take notice of: Dictionary of Occupational Titles, published by the Department of Labor; County Business Patterns, published by the Bureau of the Census; Census Reports, also published by the Bureau of the Census;

Occupational Analyses, prepared of the Social Security Administration by various State employment agencies; and Occupational Outlook Handbook, published by the Bureau of Labor Statistics; and vocational experts and other specialists (20 CFR 404.1566(d)[)].

Thus, not only do the regulations permit vocational experts to rely on various sources of statistical information, but the Agency may also rely on this information because it has been administratively noticed. The Social Security Administrations' reliance on this data is codified in the Appendix 2 to Subpart P of the Act, otherwise known as the Medical Vocational Guidelines, or "Grid Rules," and has been upheld by the United States Supreme Court, *Heckler v. Campbell*, 461 U.S. 458 (1983). Thus, by practice before this Court and others like it, the claimant's attorney has constructively received adequate notice of the types of resources used by vocational experts regarding the number of jobs available in the national economy.

Additionally, 20 CFR 404.1566(e) and 416.966(e) state: "[i]f the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialized. We will decide whether to use a vocational expert or other specialist and that reliance upon their testimony is firmly entrenched without our regulations (See, e.g., 20 C.F.R. § 404.1560 and HALLEX 1-2-5-30). In this case, the vocational expert testified she relied on numbers from the Department of Labor that encompass the various governmental and other publications with administrative notice of reliable job information. Furthermore, the vocational expert's qualifications were accepted by the representative without objection. I found no reason to doubt the vocational expert's qualifications to discuss and interpret specific issues in the Dictionary of Occupational Titles as she did in the instant case. The expert's depth of experience, educational qualifications, and vocational expertise served as an interpretative conduit beyond the Dictionary of Occupational Titles and Department of Labor information. Thus, the explanation at hearing, with supplementary information as to the accuracy of her testimony regarding the Dictionary of Occupational Titles and Department of Labor information, is regarded as expert testimony in the vocational field. After a review of the testimony, as well as the medical record, and given the unchallenged qualification as an expert, I accepted the vocational expert's testimony regarding job numbers because they were sufficiently reliable to support the conclusions hearing. Accordingly, the vocational expert's job information is found to be reliable.

> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. To any extent to which the vocational expert's testimony varied form the DOT or touched on topics upon which the DOT is silent, I find that she relied on her experience in job placement and job analysis in forming her opinions.

(Tr. 30-31).

## Analysis

Plaintiff makes one argument in favor of remand related only to the ALJ's Step Five finding (Doc. 12). She argues that the ALJ erred in relying on the vocational expert's testimony because the testimony "failed to describe job incidence data for the cited jobs and failed to describe job incidence data with a reliable methodology." (Doc. 12, p. 6). Plaintiff specifically objects to the VE's job incidence numbers because the estimates were based on a grouping of DOT occupations rather than specific figures for each individual DOT listed (Tr. 63).

The individual jobs cited by the VE include housekeeping (DOT Code 323.687-014), retail clerk (DOT Code 299.677-010), and laundry folder (DOT Code 369.687-018) (Tr. 62). DOT job titles come from a "1977 publication from the Department of Labor known as the *Dictionary of Occupational Titles*, regularly abbreviated as DOT." *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018). The Social Security Administration's regulations authorize the agency to take administrative notice of the DOT as reliable job information. *Id.* (citing 20 C.F.R. § 416.966(d)). While VEs "regularly canvass [the DOT] to identify job titles suitable for a claimant," the DOT has two significant limitations: it is outdated, and the DOT only describes "job duties and requirements" for each job,

10

without "reporting an estimate of how many of those positions exist in the national economy." *Id.* at 965.

Thus, "[t]o determine the number of jobs, a VE must consult another resource", such as the "commonly used" Occupational Employment Statistic ("OES"), which is compiled by the Department of Labor. *Id.*; *see also Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023). The OES "does not use the DOT job grouping system, but instead relies upon another classification system, the Standard Occupational Classification (SOC)." *Chavez*, 895 F.3d at 965; *Fetting*, 62 F.4th at 337. The Seventh Circuit has described the use of these two sources, the DOT and SOC, in combination as a "matching problem" because a one-to-one correlation between the two systems does not exist. *Chavez*, 895 F.3d at 965 ("[O]ne system to supply the job titles and another to provide the number of jobs, creates a matching problem."). Thus, [w]hen a VE identifies an SOC code and the number of jobs in that code, that number approximates (at best) the number of positions within a DOT job group—not the specific DOT job title that the VE identified as suitable for a particular claimant." *Id.*

Here, Plaintiff argues that the VE's job incidence testimony only described relevant SOC groups, but did not provide an opinion about job incidence data for each individual DOT occupation within the relevant SOC grouping (Doc. 12, pp. 9-10). To illustrate this argument, Plaintiff proffers that the SOC groups for each of the jobs cited by the VE (housekeeping, retail clerk, and laundry folder), are SOC 37-2012 (Maids and Housekeeping Cleaners), SOC 41-2031 (Retail Salespersons), and SOC 51-9198 (Helpers— Production Workers) (Doc. 12, citing to the DOT Crosswalk Search, available at

11

onetonline.org/crosswalk/DOT (last visited Sept. 26, 2023). According to Plaintiff, each of these SOC groupings include multiple DOT occupations, in addition to the individual jobs cited by the VE, and some of those additional DOT occupations would be precluded by Plaintiff's restrictions (Doc. 12, p. 9-10). Thus, by estimating job incidence numbers on a grouping of DOTs rather than supplying specific figures for each individual job, Plaintiff argues that the VE's testimony as to job incidence data is unreliable because it derived from an unreliable or impermissibly vague methodology (Doc. 12).

The Court agrees. As mentioned above, the Social Security Administration utilizes the job classification system in the DOT, "but the DOT does not provide estimates of the prevalence of these jobs in the national economy" so many VEs base their estimates on the OES database, "which contains annual employment estimates for 800 occupations" and uses the SOC codes. *Fetting*, 62 F.4th at 337. Because the SOC codes sort jobs "into broad occupational categories" which encompass multiple DOT job titles, vocational experts "must convert the information in the OES from the SOC system to the DOT system" when calculating job estimates. *Fetting*, 62 F.4th at 337; *see also Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022). Here, it is unclear whether the VE relied on the OES (although that seems to be the most likely source) because she only testified that she relied on "research by the Bureau of Labor Statistics" (Tr. 63). However, this uncertainty only reiterates Plaintiff's broader argument that the VE's methodology was unreliable.

At step five, "[t]he Commissioner bears the burden of establishing that the claimant can perform other work that exists in significant numbers in the national economy." Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008) (quoting 20 C.F.R §

12

404.1560(c)(2)). The Commissioner satisfies this burden if it can show that the ALJ's conclusion in this regard is supported by substantial evidence. *See* Johansen v. Barnhart, 314 F.3d 283, 287 (7th Cir. 2002). When the decision relies on job estimates from a vocational expert, the substantial evidence standard requires the ALJ "to ensure that the approximation is the product of a reliable method." *Chavez*, 895 F.3d at 968. "A 'precise count is not necessary,' but the VE's testimony 'must be supported with evidence sufficient to provide some modicum of confidence in its reliability.'" *Fetting*, 62 F.4th at 339 (quoting *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020). A reliable methodology is based on "well-accepted sources." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022). "Additionally, the VE must explain his methodology 'cogently and thoroughly,' and this explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Fetting*, 62 F.4th at 339 (quoting *Ruenger*, 23 F.4th at 763).

In the instant case, when asked about how she arrived at her numbers, the vocational expert responded with nothing more than "research by the Bureau of Labor Statistics." (Tr. 63). The VE did not specify what that research was, and she did not explain how she converted the unspecified "research" into DOT codes. The VE's vague and perfunctory answer "obscured the origin of her job estimates" and did not "set forth an understandable methodology." *See Ruenger*, 23 F.4th at 763. "Without this fundamental information, the vocational expert's testimony could not have provided the

13

ALJ with sufficient confidence that her methodology was reliable." *Id.*²

This, however, does not end the Court's inquiry. An ALJ is only required to make an inquiry into the basis for and reliability of a VE's conclusions "when confronted by a claimant's challenge." *Chavez*, 895 F.3d at 970. The Commissioner argues Plaintiff waived her right to object to the VE's testimony by failing to object at the hearing. (Doc. 16, p. 3) (citing *Coyier v. Saul*, 860 F. App'x 426, 427–28 (7th Cir. 2021) ("However, Coyier waived any challenge to the VE's testimony by failing to ask any questions to reveal shortcomings in the job-number estimates . . . These omissions effectively conceded the reliability of the VE's job numbers.").³ According to the Commissioner, post-hearing objections to testimony from a VE are "too late." (*Id.*) (citing *Gaylord v. Berryhill*, No. 17-CV-03196, 2019 WL 1330892 (C.D. Ill. Mar. 25, 2019) ("a party must object to a vocational expert's testimony at the administrative hearing to avoid forfeiting that objection.").

---

² The Court's analysis is further supported by the Seventh Circuit's decision in *Brace*, 970 F.3d 818, 822 (7th Cir. 2020). In *Brace*, the plaintiff's attorney asked the VE to explain the method he used to arrive at his job-number estimate of 140,000. He responded as follows:

> Well, it's—it's that combination of, one, you are looking at the number of titles that are in that [OES] category[,] and then based upon the—my information that I have as far as how the frequency of those jobs are performed, then we do an allocation based upon weighting or re-weighting those allocations to get the estimates of the numbers.

*Brace*, 970 F.3d at 822. The Seventh Circuit concluded that the VE's testimony did not satisfy the substantial evidence standard. *Id.* at 823. In so holding, the Appellate Court explained:

> This answer is entirely unilluminating. Testimony that incants unelaborated words and phrases such as 'weighting' and 'allocation' and 'my information that I have' cannot possibly satisfy the substantial-evidence standard. What allocations? How is the weighting and re-weighting performed? According to what criteria? And what is the unidentified 'information' in the expert's possession?

*Id.* at 822. Here, the VE's answer provided even *less* information than the answer at issue in *Brace*.
³ The Commissioner does not otherwise argue that the VE's testimony or methodology was reliable.

A claimant must object to a VE's estimates or otherwise indicate that the methodology is unreliable at the administrative level to preserve the issue on appeal. *Fetting*, 62 F.4th at 337. The Seventh Circuit requires "parties to object to issues and preserve arguments for a reason—first and foremost, to ensure that all sides develop the record they wish to subject to appellate review." *Leisgang v. Kijakazi*, 72 F.4th 216, 219 (7th Cir. 2023). Further, "a claimant may not start objecting to unquestioned and uncontradicted VE testimony in federal court after the closure of the administrative record." *Id.* at 220.

As noted by the Commissioner, some district courts have concluded that post-hearing objections are too late to preserve an issue for appeal. The Court also observes that there are Seventh Circuit decisions that contain language suggesting objections not raised during the hearing are waived. *See Fetting*, 62 F.4th at 332 ("A claimant who fails to object *at the hearing* forfeits any challenge to the VE's testimony.") (emphasis added). However, the Seventh Circuit's most recent decision addressing this issue, *Leisgang*, 72 F.4th 216, suggests otherwise: "As we explained in *Fetting*, a claimant must object to the VE's testimony or otherwise indicate that the testimony is unreliable during the administrative hearing (*or after, in a posthearing brief*) to preserve his objection." *Id.* at 220 (emphasis added).

Considering the Seventh Circuit's decision in *Leisgang*, the Court finds that Plaintiff's possthearing objection was not too late. This, however, does not necessarily mean that Plaintiff's objection has been preserved. The Seventh Circuit has also emphasized that "[g]eneral objections or vague questions about the VE's methodology

15

are, without more, insufficient." *Id*. Thus, the Court must also consider whether Plaintiff's posthearing objection was specific enough to preserve the issue for appeal. The Seventh Circuit's decision in *Fetting*, 62 F.4th 332 is instructive on this issue. In *Fetting*, the plaintiff's attorney did not make any pre or posthearing objections as to the VE's job number testimony. The Plaintiff, however, argued that his lawyer's questioning at the hearing sufficiently preserved the issue for appeal. In rejecting this argument, the Seventh Circuit provided the following guidance:

> [The] objection must be specific; to avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology. *Compare Coyier v. Saul*, 860 F. App'x 426, 427–28 (7th Cir. 2021) (finding forfeiture where the claimant made only one general objection and asked no specific questions), *with Chavez*, 895 F.3d at 966 (addressing the claimant's arguments where she made "repeated" objections about the VE's use of the equal distribution method), *and Brace v. Saul*, 970 F.3d 818, 821 (7th Cir. 2020) (addressing the claimant's arguments where he objected that the VE's estimate "*lacked sufficient foundation and methodological rationality*").

*Fetting*, 62 F.4th at 338 (emphasis added). The Seventh Circuit concluded that, although the plaintiff's attorney asked the VE "four questions regarding the VE's methodology," he did not preserve the issue for appeal because he did not "otherwise object or indicate that he *believed the methodology was unreliable*." *Id*. (emphasis added).

Here, Plaintiff's posthearing letter expressly indicated that she believed the VE's "job incidence data lack[ed] a reliable methodology." (Tr. 295). She further indicated that there was "no specific confirmable methodology described in the record, and no evidence that the VE's methods for obtaining job incidence data are reliable and well-accepted, or why that is so." (Tr. 295). This objection clearly indicated that Plaintiff's counsel believed

16

the VE's methodology was unreliable. Thus, after receiving Plaintiff's objection, the ALJ was required to ask the "VE to offer a reasoned and principled explanation." *Chavez*, 895 F.3d at 970. Here, the ALJ could have done so by asking the vocational expert to further support her estimate by offering an explanation after the hearing. *Id.* The ALJ did not do this. Instead, the ALJ rejected the objection because it was not raised during the hearing (Tr. 30). The ALJ then adopted the VE's testimony, ignoring the fact that the VE did not describe her methodology or clearly identify the source of her job incidence data (Tr. 30-31).

      The ALJ attempted to justify her decision by emphasizing that the VE's sources derived from sources that are properly subject to administrative notice as reliable job information; that Plaintiff had constructive and actual notice of the reliability of the sources used by the VE; and based on the VE's uncontested qualifications to discuss and interpret specific issues in the DOT (Tr. 30-31). To this last point, the ALJ emphasized that the VE's "depth of experience, educational qualifications, and vocational expertise served as an interpretative conduit beyond the Dictionary of Occupational Titles and Department of Labor information." (Tr. 31). These findings may well be true, and for the purposes of this Order, the Court assumes that the VE was well qualified to offer her opinion and used reliable job sources. However, the inquiries into whether an expert is qualified to offer an opinion and used reliable sources differs from the question of whether the expert utilized a reliable methodology in reviewing those sources. Further, the fact that an individual is "qualified" to render an opinion does not necessarily mean that the opinion offered is the product of reliable methodology.

Because Plaintiff's post-hearing letter raised arguments that called into question the reliability of the VE's conclusions, the burden was on the ALJ to investigate the VE's methods and find out whether the VE's conclusions were reliable. *Leisgang*, 72 F.4th 216, 219-220; *Overman*, 546 F.3d at 464–65. The ALJ failed to do this, and the Court cannot determine how the VE reached the job incidence numbers she provided. As such, the ALJ's conclusion that there are significant numbers of jobs in the national economy for Plaintiff to perform is not based on substantial evidence, and remand is required.

## Conclusion

For these reasons, the final decision of the Commissioner of Social Security denying Plaintiff's application for benefits is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.  The Clerk of Court is DIRECTED to enter judgment in favor of Plaintiff and against Defendant.

**SO ORDERED.**

Dated: September 27, 2023

/s *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge